# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| RENEE J. AND CORNELIUS J.<br>AS PARENTS/GUARDIANS/NEXT<br>FRIENDS OF C.J., A MINOR<br>INDIVIDUAL WITH A DISABILITY,<br>    Plaintiffs,<br><br>VS.<br><br>HOUSTON INDEPENDENT<br>SCHOOL DISTRICT,<br>    Defendant. | § § § § § § § § § § § § | CIVIL ACTION NO. 4:16-cv-02828 |

## MEMORANDUM AND OPINION

This is one of many cases asking a court to determine if a public school has met its obligation under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, to give a student with disabilities a free appropriate public education. The parents of C.J., a student with disabilities, are dissatisfied with the education and services C.J. received from the Houston Independent School District. C.J.'s parents asked for homebound education services for their son, and the District denied the request. The District held a four-day due process hearing, at which the hearing officer received evidence. The hearing officer issued a written decision in the District's favor. The parents appeal on C.J.'s behalf. The parties have cross-moved for summary judgment.

Based on careful consideration of the pleadings; the parties' motions, responses, and replies; the record; the arguments of counsel; and the applicable law, the court grants the District's motion for summary judgment and denies C.J.'s cross-motion. The issues presented and the reasons for the ruling are analyzed below.

## I. Background

C.J. is now a 17-year old high-school student in the Houston Independent School District. (Docket Entry No. 6-1 at 55). C.J. qualifies for special education services. His diagnoses include autism, emotional disturbance, and attention-deficit hyperactivity disorder. (Docket Entry No. 6-1 at 57, 94). C.J. attended FM Black Middle School for 8th grade during the 2014–2015 school year, when he was 14 years old. (Docket Entry No. 27-1 at 2). In October 2014, the District held C.J.'s annual Admission, Review, and Dismissal (ARD) meeting to discuss his Individualized Education Plan. (Docket Entry No. 6-19 at 23). The ARD Committee heard from C.J., his teacher, Ms. O'Finan, and C.J.'s parents, (*Id.* at 54, 61, and 63), and decided on a Plan to address C.J.'s academic, vocational, and behavioral needs. (*Id.* at 23–58). The Plan included steps for post-high school transition work, based on C.J.'s interest in a law-enforcement career. (*Id.* at 30, 38, 61). The Plan included specific considerations of C.J.'s autism diagnosis, as required by the Texas Autism Supplement, a regulation that provides 11 strategies that an ARD Committee must consider when crafting a Plan for a student with autism. (*Id.* at 41); 19 Tex. Admin. Code § 89.1055(e).

In November 2014, C.J.'s behavior began to deteriorate. Ms. O'Finan, who taught him Skills for Living and Learning, met with C.J.'s mother to discuss his behavior. (Docket Entry No. 27-6 at 1). In January 2015, C.J.'s mother complained to the school that C.J. was being harassed and bullied, including by his teachers' assistants. (Docket Entry No. 27-14 at 5–6). She complained that the harassment had caused C.J. to "melt down" the day before. (*Id.*). C.J.'s mother wanted her son to be "placed in homebound" because of bullying at school. (*Id.*). A few days later, C.J.'s parents began keeping him home from school. (Docket Entry No. 27-3 at 4). The school worked with the parents to accommodate their request for homebound services, but ultimately denied the request

during an ARD meeting on April 30, 2015. The stated reason was the absence of documents from C.J.'s doctors to show that he was confined to home and unable to attend school due to a medical need. This documentation is required to qualify a student for homebound services under the District's written policy. (Docket Entry Nos. 27-9 at 33; 27-14 at 11–21; 27-19 at 6–40). By April 2015, C.J. had missed a significant amount of the spring semester.

At the April 2015 meeting, the ARD Committee created a transition plan to facilitate C.J.'s return to school. (Docket Entry No. 27-9 at 5). C.J. returned to school for one day in May 2015, but his parents continued to keep him home after that. (Docket Entry No. 52-2 at 289). Another ARD meeting was held in June to discuss whether C.J. should advance to 9th grade. (Docket Entry No. 27-20). The ARD Committee recommended that C.J. participate in Extended School Year Services over the summer to make up for his absence in the spring semester. (Docket Entry No. 27-20 at 17). The District contacted C.J.'s parents to inform them that he had been approved for Extended School Year Services. (Docket Entry No. 27-6 at 4). An email exchange between the District and C.J.'s mother about where C.J. would get these services followed, but C.J. never attended the program. (Docket Entry No. 6-24 at 74–76).

The ARD Committee met again in August 2015 to discuss C.J.'s transition to the 9th grade at Booker T. Washington High School. (Docket Entry No. 6-20 at 89). C.J.'s new Individualized Education Plan added compensatory time to make up for C.J.'s absences in the 8th grade and steps to continue revising the Plan goals based on information that was unavailable because of his absences. (Docket Entry No. 6-21 at 20–21).

The first few weeks of 9th grade went smoothly, until C.J. punched another student. (Docket Entry No. 52-2 at 413). C.J.'s parents again kept him home from school for a few days. (Docket

3

Entry No. 26-6 at 5). The District reevaluated C.J. on October 28, 2015. (Docket Entry No. 6-13 at 32). The ARD Committee met the next day to discuss the evaluation and to update C.J.'s Individualized Education Plan. (Docket Entry No. 6-21 at 80). C.J.'s parents remained dissatisfied. In December 2015, they made a formal request for a due-process hearing. (Docket Entry No. 6-1 at 12). A four-day evidentiary hearing was held in May 2016. (Docket Entry No. 6-1 at 2).

The hearing officer found for the District after considering testimony from 21 witnesses and thousands of pages of exhibits. (Docket Entry No. 6-1 at 2; Docket Entry No. 52). C.J. presented an expert witness, and both parties submitted written closing arguments. (Docket Entry No. 6-1 at 2). In the decision issued in August 2016, the hearing officer found and concluded that the District did not deny C.J. the free appropriate public education required by the Individuals with Disabilities Education Act. (Docket Entry No. 6-1 at 2–9). C.J.'s parents filed this suit to appeal that decision.

## II.    The Legal Standard

A district court reviews the decision of a due process hearing officer "virtually *de novo*." *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). "When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 582-83 (5th Cir. 2009) (quoting *Michael F.*, 118 F.3d at 252). "Although the district court is to give 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Id.* (citation omitted). "As a practical matter, the IDEA creates a presumption in favor of the education plan proposed by the school district, and places the burden of proof on the party challenging it." *E.R.*

*v. Spring Branch Indep. Sch. Dist.*, No. 4:16-CV-0058, 2017 U.S. Dist. LEXIS 110524, at *42 (S.D. Tex. June 15, 2017) (citing *Salley v. St. Tammany Parish Sch. Bd.*, 57 F.3d 458, 467 (5th Cir.1995)). In reaching this decision, "courts must be careful to avoid imposing their view of preferable educational methods upon the State." *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). State and local authorities have primary responsibility for educating children and "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Rowley*, 458 U.S. at 207-08.

In an appeal under the Act, "[s]ummary judgment is 'not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's education needs have been appropriately addressed.'" *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *41–42 (citing *Seth B. v. Orleans Parish School Board*, 810 F.3d 961, 967 (5th Cir. 2016)).

The cross-motions are analyzed under this legal standard.

## III. Analysis

"The IDEA's purpose is to ensure that children with disabilities have access to 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'" *C.G. by & through Keith & Linda F. v. Waller Indep. Sch. Dist.*, No. 16-20439, 2017 WL 2713431, at *2 (5th Cir. June 22, 2017) (quoting 20 U.S.C. § 1400(d)(1)(A)). A school must provide students eligible under the Act with "an individualized program of education" in the form of an Individualized Education Plan. *Woody*, 865 F.3d at 309. "The [Plan] must be 'reasonably calculated

5

to enable a child to make progress appropriate in light of the child's circumstances.'" *Id.* (quoting *Endrew F. ex rel Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)). "The IDEA does not require an IEP that maximizes the student's potential, nor does it require educational opportunities 'substantially equal to the opportunities afforded children without disabilities.'" *Spring Branch*, 2017 U.S. Dist. 110524 at *43 (quoting *Endrew F.* 137 S. Ct. at 1001). "Instead, the IEP must be 'likely to produce progress, not regression or trivial educational advancement.'" *Id.* (quoting *Michael F.*, 118 F.3d at 248).

The Act imposes procedural and substantive requirements on school districts. *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *44. Parents who disagree with their child's Individualized Education Plan have the right to request an administrative due-process hearing. 20 U.S.C. § 1415(f). "When a parent challenges the appropriateness of an IEP, a reviewing court's inquiry is twofold." *Juan P.*, 582 F.3d at 583. The court must consider (1) whether the school complied with the procedural requirements of the IDEA; and (2) whether "the IEP developed through such procedures was 'reasonably calculated to enable the child to receive educational benefits.'" *Id.* (quoting *Rowley*, 458 U.S. at 201).

### A.    The Substantive Requirements Under the Act

The Fifth Circuit has identified four factors for district courts to analyze in determining whether a school district has substantively denied a student a free appropriate public education. *See Michael F.*, 118 F.3d at 253. C.J. asserts that the Supreme Court's decision in *Endrew F.* articulated a new standard and that the hearing officer applied the wrong test in reaching his decision. (Docket Entry No. 43 at 30). The Fifth Circuit, however, has found that *Michael F.* is consistent with *Endrew F. See Waller*, 2017 WL 2713431, at *2 ("Although the district court did not articulate the standard

6

set forth in *Endrew F.* verbatim, its analysis of [the student's Plan] is fully consistent with that standard and leaves no doubt that the court was convinced that [the student's Plan] was 'appropriately ambitious in light of [her] circumstances.'"). The four-factor test from *Michael F.* remains valid in this circuit to assess whether a student with disabilities received a free appropriate public education. Under the test, the district court must consider: (1) whether the program was individualized on the basis of the student's assessment and performance; (2) whether the program was administered in the least restrictive environment; (3) whether the services were provided in a coordinated and collaborative manner by key "stakeholders"; and (4) whether positive academic and non-academic benefits were demonstrated. *Michael F.*, 118 F.3d at 253. The Fifth Circuit has "not held that district courts must apply the four factors in any particular way," but only "that these factors are 'indicators' of an IEP's appropriateness, intended to guide a district court in the fact-intensive inquiry of evaluating whether [a Plan] provided an educational benefit." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 294 (5th Cir. 2009).

The District argues that it satisfied its legal obligations under the *Michael F.* factors. C.J.'s parents do not apply the four-factor test, but instead they argue that the District's decisions about C.J. denied him a free appropriate public education. Each argument is considered below.

### 1.    The Claim that the District Wrongly Denied C.J. Homebound Services

C.J.'s parents argue that the District wrongly denied C.J. homebound services, which left him without access to services for five months. (Docket Entry No. 43 at 40). The District argues that it reviewed C.J.'s circumstances, his Plan, the documents his parents submitted, and determined that he did not qualify for homebound services, and that homebound services would not have been the least restrictive environment for him. (Docket Entry No. 46 at 34). The District argues that it was

C.J.'s parents' decision to keep him home, despite the fact that he did not qualify to receive services there, that deprived him of access to these services.

Homebound education services are available as a temporary arrangement for students who are medically unable to attend school. (Docket Entry No. 27-9 at 33). According to the District's established written policy, homebound services are not available based solely on a psychological referral, but instead require a physician to document medical need. (*Id.*).[1]

The record demonstrates that C.J.'s parents requested homebound services for him based on bullying at school. (Docket Entry No. 27-9 at 37–38). The record also shows that the District repeatedly informed C.J.'s parents of the requirements under the District's written policy. That policy made clear that bullying is not a sufficient basis to provide homebound services. (Docket Entry No. 27-9 at 35-38). The policy also made clear that C.J.'s doctors had to provide documents showing that he could not attend school and had to stay home for medical reasons. Despite this information, C.J.'s parents voluntarily kept him at home, out of school, from January 23, 2015 to April 30, 2015, because of their concern over bullying. The parents did not submit documentation showing a qualifying medical need. (Docket Entry No. 6-1 at 92; Docket Entry No. 27-9 at 37). They did not accept the District's investigation, which found no evidence of repeated or oppressive bullying. The record demonstrates that C.J.'s parents insisted on homebound education services and did not accept the alternatives the District proposed. (Docket Entry No. 27-9 at 17; Docket Entry No. 27-19 at 13). The parents' refusal to accept the services the District offered under C.J.'s

---

[1] The District's policy provides: "Consistent with the TEA's Student Attendance Accounting Handbook, a student who is expected to be confined for a minimum of four weeks at home or in a hospital bed for medical reasons specifically documented by a physician licensed to practice in the United States may be eligible for general education homebound services." (Docket Entry No. 27-18 at 1); *see also* Docket Entry No. 27-9 at 45 ("This referral process is NOT to be used for psychological referrals.").

Individualized Education Plan and the Extended School Year Services is not a denial of services by the District. The record evidence amply supports the hearing officer's finding that "[t]he student's educational program . . . was available but not accessed by the student and the student's family." (Docket Entry No. 6-1 at 7).

### 2. The Claim that the District Did Not Provide C.J. a Plan Based on Peer-Reviewed Research

C.J.'s parents argue that the District denied C.J. a free appropriate public education because it did not use Applied Behavioral Analysis in fashioning and implementing his Individualized Education Plan. The Act requires school districts to use methods based on peer-reviewed research to deliver services to students with disabilities. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). The District responds that, while Applied Behavioral Analysis is "one methodology that can be utilized" for children with autism, "it is only one methodology and the law does not require its use." (Docket Entry No. 47 at 15).

The Texas Autism Supplement lists 11 strategies that "must be considered" and, "when needed, addressed in the [Individualized Education Plan]." 19 Tex. Admin. Code § 89.1055(e). The Autism Supplement includes a requirement that an ARD Committee consider "teaching strategies based on peer reviewed, research-based practices for students with [autism spectrum disorder] (for example: those associated with discrete-trial training, visual supports, applied behavior analysis, structured learning, augmentative communication, or social skills training)." 19 Tex. Admin. Code § 89.1055(e)(11). The Supplement supports the District's position that Applied Behavioral Analysis is one example of peer-reviewed practices, but not the only option.

The record does not show that C.J.'s parents specifically asked the District to use Applied

Behavioral Analysis in devising and implementing his Individualized Education Plan. C.J. does not point to anything other than the failure to use Applied Behavioral Analysis as a substantive flaw in his Plan. The record shows that, as C.J. acknowledges, Dr. Moore, a licensed specialist in school psychology working for the District, testified that in the Individualized Education , the District "was implementing an [Applied Behavioral Analysis] program for C.J." in October 2015. (Docket Entry No. 43 at 23, ¶ 65).

The record evidence also shows that C.J.'s teachers, mother, and other participants in the October 2015 ARD meeting did discuss the Texas Autism Supplement requirements. (Docket Entry 27-21 at 69–82). Although neither the discussion nor the Plan identified the Texas Autism Supplement by name, the record shows that the District complied with its obligation to discuss the substance of the supplement and what it required. For example, the Supplement requires consideration of "extended educational programming." 19 Tex. Admin. Code. § 89.1055(e)(1). The ARD Committee discussed Extended School Year Services for C.J. (Docket Entry No. 27-21 at 75). The Supplement requires consideration of "daily schedules reflecting minimal unstructured time." § 89.1055(e)(2). The ARD Committee discussed creating a daily schedule for C.J. both at home and at school. (Docket Entry No.21-27 at 69). The Supplement requires consideration of "positive behavior support strategies." § 89.1055(e)(4). The ARD Committee discussed giving C.J. stars that represented police badges each time he behaved well and giving him a reward after he earned a certain number of stars, including taking him to visit the police station and to his favorite restaurant. (Docket Entry No. 21-27 at 68–69). The record does not show that the District denied C.J. a free appropriate public education by failing to use Applied Behavioral Analysis in devising and implementing his Plan or that it failed to discuss the substance of the Texas Autism Supplement

when creating C.J.'s Plan.

C.J. also argues that the District denied him a free appropriate public education because it failed to provide him a "meaningful transition program." (Docket Entry No. 43 at 38). The District responds that a formal transition assessment was not required in C.J.'s 9th grade year, when he was 15, and that even if it was required, the program put in place did address preparing C.J. to make the transition from school based on his interests and goals. (Docket Entry No. 47 at 16).

Texas state law requires an ARD Committee to consider student and parent involvement in planning a student's transition to life outside the public school system "not later than when a student reaches 14 years of age." 19 Tex. Admin. Code § 89.1055(h)(1)–(2). The federal Act and the Texas Administrative Code require the student's Individualized Education Plan to include "appropriate measurable postsecondary goals based upon age-appropriate transition assessments" and the "transition services" required to reach those goals, "beginning not later than the first IEP to be in effect when the student turns 16 years of age, or younger if determined appropriate by the ARD committee." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); 19 Tex. Admin. Code § 89.1055(i). The record shows that the District began considering C.J.'s transition in March 2014, when he was 13 and in the 7th grade, meeting the legal requirement. (Docket Entry No. 6-18 at 86).

C.J.'s parents argue that the transition steps in the Plan were "unrealistic" because they included a goal of having C.J. research information about becoming a law-enforcement officer. (Docket Entry No. 43 at 38). The transition steps included the following specific goals: to "research the field of law enforcement and report three careers of interest in that field"; to "identify and demonstrate examples of 3 work habits necessary to be successful in the field of law enforcement"; and to "research 3 colleges that have degree programs in law enforcement/criminal justice and

11

identify three steps needed to apply." (Docket Entry No. 6-21 at 87). Other specific goals included that: "C.J. will attend career events offered by the school, district, and online research"; "when given invitations to participate with peers' performances, field trips, career events, and CBI, C.J. will participate in campus events"; and "C.J. will employ strategies to help self regulate his frustration." (Docket Entry No. 6-20 at 20–29). These are steps toward the goal of post-secondary work in law-enforcement goals. The transition steps identified measurable ways to develop C.J.'s knowledge of colleges and careers in the area of interest C.J. had identified, and to help C.J. develop skills in finding information about his area of interest. The goals were individualized and tailored to C.J.'s interests and needs. The record evidence supports the hearing officer's finding that the District "worked consistently and conscientiously" with C.J.'s parents to develop and implement a meaningful transition program for C.J.'s benefit. (Docket Entry No. 6-1 at 7).

### 2. The Claim that the District Ignored C.J.'s Vision Needs

C.J.'s parents allege that the District denied C.J. a free appropriate public education because it failed to include in his Plan the goal for him to wear his glasses during class. C.J. argues that *Endrew F.* required the District to provide a reasonable program for the specific circumstances C.J. presented, including his vision impairment. (Docket Entry No. 43 at 39).

C.J.'s parents first reported his vision impairment to the District in October 2015. (Docket Entry No. 6-6 at 192). The District argues that the evidence shows that during the relevant period, C.J. attended school without glasses and passed his vision screening. The District argues that no record evidence supports the claim that C.J. "demonstrated [unmet] vision-related needs in the classroom." (Docket Entry No. 46 at 32). C.J.'s own expert, Dr. Peter Simione, a licensed specialist in school psychology, noted that C.J. "did not wear glasses" and that his "[v]isual tracing and

convergence appeared to be within normal limits." (Docket Entry No. 6-22 at 65).

It is undisputed that C.J. has a significant vision problem in one eye. The record, however, shows that he has "almost normal vision bilaterally." (Docket Entry No. 52-2 at 159, 169). The record evidence shows that when C.J.'s parents reported his vision impairment and requested an evaluation, the District agreed, but C.J. was unavailable on the date set for the vision evaluation. (Docket Entry No. 52-2 at 172).

The hearing officer found that the school's vision screening showed that C.J.'s vision was within normal limits, that C.J. would frequently attend school without his glasses, and that his vision problems did not interfere with the District's obligation to provide him adequate services. (Docket Entry No. 6-1 at 7). These findings are supported by the record evidence, including the testimony of C.J.'s own expert witness. The record evidence supports the hearing officer's finding and conclusion that the District's approach to C.J.'s vision problems did not deny him a free appropriate public education.

### 3. The Claim that C.J.'s Lack of Progress Amounted to a Denial of a Free Appropriate Public Education

C.J. argues that the District denied him a free appropriate public education because he did not make progress in his Plan. (Docket Entry No. 43 at 40). C.J. points to the five months he was without services, the period that C.J.'s parents kept him home from school, followed by the summer break. (Docket Entry No. 43 at 40). C.J. argues that when he returned to school in the fall of 2015 for the 9th grade, he "stagnated with the same old law enforcement goal" and continued to have behavior problems. (Docket Entry No. 43 at 40).

The District responds that C.J. made passing grades when he returned to school in the 9th

grade. According to his teachers who testified at the hearing, C.J. made meaningful progress in both academics and behavior during this year. (Docket Entry No. 47 at 17). The hearing officer noted that "[t]he student's absence from school created additional obstacles in the educational process" and that during the five-month extended absence, C.J. "was not available to access the special education services afforded." (Docket Entry No. 6-1 at 7). C.J. did not receive homebound services during this period because he did not provide the District with documents showing medical needs that made him eligible to receive those services. (Docket Entry No. 6-1 at 7). The record supports the finding that the District frequently communicated with C.J.'s parents during the five months they kept him at home. The communications were aimed at getting C.J. back to school as quickly as possible. (Docket Entry No. 27-6 at 2–3). The hearing officer found that despite the absence and the obstacles it presented, his progress at school produced "results [that] were legally sufficient." (Docket Entry No. 6-1 at 7). The record supports the hearing officer's findings and conclusions that C.J. made the progress required under the Act.

### 4.      The Claim that the District Did Not Meet Its Obligations under the Act

The District moves for summary judgment on the ground that it met its legal obligation to provide C.J. a free appropriate public education, in the least restrictive environment to enable him to realize meaningful academic and non-academic benefits. The District argues that C.J.'s Plan was "reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances," as the Act required. (Docket Entry No. 46 at 24). Based on the *Michael F.* factors, the District contends that the record supports the hearing officer's determination that it provided C.J. a free appropriate public education. (Docket Entry No. 46 at 25). The court agrees.

C.J. argues that the District relies on the incorrect legal standard and that *Endrew F.* changed

14

the standard under the Act in a way that makes the services the District provided insufficient. (Docket Entry No. 48 at 35). This argument is unpersuasive. As noted, the Fifth Circuit has held that the factors set out in *Michael F.* are consistent with the Supreme Court's later decision in *Endrew F. See Waller*, 2017 WL 2713431, at *2. Under both, a Plan is substantively appropriate under the Act if it is: (1) individualized based on the student's needs; (2) administered in the least restrictive environment; (3) administered in a coordinated and collaborative manner by key stakeholders; and (4) has demonstrated positive academic and non-academic benefits. *Michael F.*, 118 F.3d at 247.

The first *Michael F.* factor is satisfied. The record amply supports the finding that C.J.'s Plan was "designed with his specific behavioral and academic problems in mind." *Michael F.*, 118 F.3d at 253. This court's job is to determine "whether the [Plan] is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999 (emphasis in original). The lengthy record includes a number of detailed, individual Plans the District devised and implemented for C.J. over the years. (*See, e.g.*, Docket Entry No. 6-19 at 23). C.J.'s 8th grade Plan, implemented in October 2014, included an in-depth discussion of C.J.'s specific behavioral and academic issues, what goals were appropriate, and what steps could achieve those goals. One issue was that C.J. "has difficulty accepting the concept of patience [and] can be distracted by other students." To address this, "[s]taff will provide C.J. with an agenda book to help keep him organized" and "[f]requent checks for understanding will help ensure that C.J. understands and will lessen the level of frustration." (Docket Entry No. 6-19 at 45). "Parent likes the use of a checklist rather than velcro schedule. Ms. O'Finan will continue to use the checklist and C.J. responds well to schedule." (*Id.* at 46). To address C.J.'s frustration issues, "[g]um chewing indicated as a stress reliever and parent will

provide gum," and "Ms. O'Finan provides areas for stress relief." (*Id.*). For social skills, "C.J. eats lunch with group of friends and is making progress socially." (Docket Entry No. 6-19 at 45–46, 52). Noting that C.J. was "able to solve basic math problems such as one digit addition and subtraction problems," the Plan set a goal for C.J. "to compare numbers using less than and more than" and to "solve simple word problems." (Docket Entry No. 6-19 at 26, 29).

During the five months that C.J.'s parents kept him out of school, C.J. did not use the services the District had planned to make available to C.J. in the second semester of his 8th grade year. (Docket Entry Nos. 27-9 at 35; 27-19 at 13). His absence also limited the information the District had available to devise and implement a new Plan for the beginning of C.J.'s 9th grade year. The 9th grade Plan that was developed in August 2015, when the school year started, was still sufficiently individualized to meet C.J.'s needs, including the needs created by his extended absence. (Docket Entry No. 6-20 at 89). For example, the Plan specifically provided for tutoring to make up for the services missed during the prior year. (Docket Entry No. 6-21 at 21). As discussed above, the District's failure to specifically cite Applied Behavioral Analysis in the Plan did not negate its individualized nature, as C.J.'s parents argue. The Plan, including the transition goals, were tailored to his specific interests and to his individual needs. The record supports the hearing officer's finding that C.J.'s Plans were individualized as the Act requires.

The second *Michael F.* factor requires that "[t]o the maximum extent appropriate, children with disabilities should not be removed from the regular education environment unless education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Ruffin v. Houston Indep. Sch. Dist.*, 459 Fed. App'x 358, 362 (5th Cir. 2012) (citations omitted). The District argues that it administered C.J.'s placements in the least restrictive environment, and

that homebound services were not the least restrictive environment for C.J. (Docket Entry No. 46 at 33). The record supports the hearing officer's finding that the District had an appropriate Plan in place in the 8th grade year for services in school that C.J. could not and did not use because his parents kept him home, even though they did not provide the District with information showing a qualifying medical need. The record shows that homebound services delivered to C.J. in isolation from all other students would be in a highly restrictive environment. *See, e.g., Marc V. v. N.E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 594–96 (W.D. Tex. 2006) (finding that the plaintiff's denial of homebound services was appropriate because "[m]any of [his] IEP goals would be practically impossible to implement in a homebound setting," which made it not the least restrictive environment available); *Jefferson Parish Sch. Bd. v. Picard*, No. 97-0507, 1998 U.S. Dist. LEXIS 1364, at *11, n.19 (E.D. La Feb. 2, 1998) (noting that placing a nonverbal student with autism in a homebound setting when other alternatives existed would deny him his right to be educated in the least restrictive environment).

The third *Michael F.* factor requires a District to administer a student's Plan in a coordinated and collaborative manner that includes the key stakeholders. "The IDEA contemplates a collaborative process between the district and the parents." *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *84. "The right to provide meaningful input is not the right to dictate the outcome." *Id.* at *85 (citing *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373 (5th Cir. 2003)). The record evidence shows that the District consistently included C.J.'s parents in the ARD Committee meetings to devise and implement C.J.'s Plans. (Docket Entry Nos. 6-20 at 8; 27-6 at 2–4; 27-14 at 19; Docket Entry No. 6-19 at 76 (parent present at April 2015 ARD Committee meeting); Docket Entry No. 6-20 at 61 (both parents present at June 2015 ARD Committee meeting); Docket Entry

No. 6-21 at 22 (both parents present at August 2015 ARD Committee meeting); Docket Entry No. 6-21 at 65 (both parents present at September 2015 ARD meeting); Docket Entry No. 6-22 at 21 (both parents present at October 2015 ARD meeting). That C.J.'s parents did not get the homebound services they wanted does not diminish their meaningful input or the District's coordinated and collaborative efforts to work with them.

The District included C.J.'s own input in crafting and implementing his Plans. (Docket Entry No. 6-19 at 61–62) (Student Input Form). His teachers also provided input. (Docket Entry No. 6-19 at 63) (Teacher Input Form). Many of the "key stakeholders" were routinely present at C.J.'s ARD Committee meetings. The April 2015 ARD Committee meeting participants included: Ms. O'Finan, C.J.'s Life Skills teacher and case manager; Joi Ross-Moore, the school's special education department chair; Darlene Losco, the District's homebound-services coordinator; Dr. Wilson, a licensed specialist with Sol Psychology, an independent agency; Anna Spar of Partners Resource Network; and C.J.'s parents. (Docket Entry No. 27-19 at 6). The June 2015 ARD Committee meeting included: Dr. Jennifer Montgomery, a licensed specialist in school psychology with the District; Bradley Berry, the dean of students in the District; Deborah Stokes, a general education teacher at Booker T. Washington High School; Alyssa Nelson, a special education teacher; Jackie Cross, a special advocate for the family; and C.J.'s parents. (Docket Entry No. 27-20 at 10). The October 2015 ARD Committee meeting included: Mrs. Goffney, C.J.'s case manager and special education teacher; Alyssa Nelson, the District's department chair for special education; Donna Johnson, speech therapist; Dr. Moore, the District's special education school psychologist; teachers Mr. Gibson and Ms. Watson; family support members; C.J.'s parents; and Jennifer Long, a diagnostician. (Docket Entry No. 27-21 at 10–11). The record evidence amply supports the finding

that the District included and collaborated with key stakeholders in crafting and implementing C.J.'s Plans.

The final *Michael F.* factor requires a student's Plan to be reasonably calculated to result in "demonstrable academic and non-academic benefits." 118 F.3d at 253. No bright-line rule establishes the benchmark benefits needed to satisfy this factor. Rather, "[t]he adequacy of a given [Plan] turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S.Ct. at 1001. "[T]he IDEA 'generates no additional requirement that the services so provided be sufficient to maximize each child's potential.'" *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346 (5th Cir. 2000) (quoting *Rowley*, 458 U.S. at 198). Obtaining a "meaningful benefit" requires a school district to provide "a basic floor of opportunity that consists of access to specialized instruction and related services individually designed to provide [the student] with educational benefit." *Houston Indep. Sch. Dist. v. VP*, 582 F.3d 576, 590 (5th Cir. 2009) (citations omitted). The benefits must be more than *de minimis. Id.* "Passing grades and advancement from year to year are factors that indicate a child is receiving meaningful educational benefit" unless they are "the product of unapproved deviations from the [Plan]." *Id.* This "holistic perspective" is "not solely disability remediation." *Klein v. Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 398 (5th Cir. 2012).

The District had an Individualized Education Plan in place for C.J. for his 8th grade year, but his parents' decision to keep him out of school meant that C.J. did not access the Plan for the spring semester of that year. "Schools are not required to force or motivate students to take advantage of the education they offer -- this is the parents' role." *Austin Ind. Sch. Dist. v. Robert M.*, 168 F. Supp. 2d 635, 640 (W.D. Tex. 2001). The District repeatedly tried to help C.J. return to school in the spring of 2015 and, when he did return in the fall, to offer services to help make up for the time he

19

missed. After his return, C.J. did show progress under the Plan put into place in the fall of 2015 for his 9th grade year. C.J.'s 9th grade teacher, Mrs. Goffney, testified at the hearing that C.J. did "well in her class when he wants to get on the computer." (Docket Entry No. 6-22 at 19). Ms. Payne, C.J.'s learning and living skills teacher, reported that he had "made great progress," during the second part of his 9th grade year, and that he "participates," and "completes his assignments." (Docket Entry No. 52-2 at 352). Ms. Payne testified that C.J. was responding to the incentives for good behavior set by the Plan and frequently "wants to know what his reward is going to be." (Docket Entry No. 52-2 at 352). Ms. Payne also testified at the hearing that C.J. "loves math . . . [and] runs through those math lessons very quickly using the devices we give [the students]." (Docket Entry No. 52-2 at 353). Ms. Payne had no behavioral problems with C.J. other than needing to redirect him when he "blurted out" in class. (Docket Entry No. 52-2 at 353).

C.J.'s parents argue that "[t]his Court cannot rely upon subjective teacher and provider testimony as a basis upon which to determine whether the child received a free appropriate education." (Docket Entry No. 48 at 40). But they cite no authority to support this argument, and the case law supports a different conclusion. *See, e.g., D.L. v. Clear Creek Indep. Sch. Dist.*, No. 16-20673, 2017 U.S. App. LEXIS 9840, at *8 (5th Cir. June 2, 2017) ("Finally, we have recognized that teacher observations—like those on which the District relied stating that [the plaintiff's] disability was not affecting his academics or behavior—are especially instructive as they spend more time with students than do outside evaluators."). The testimony by C.J.'s teachers describes his specific behaviors and accomplishments, not their subjective impressions of his intellectual or behavioral status. Their descriptions are among the reliable indicators of C.J.'s performance and progress in school.

C.J.'s parents highlight specific instances of his "stagnated progress" or "regression" in completing specific Plan goals to argue that he made no progress. They point to the goal that C.J. work on self-regulating his frustration 40% of the time in October 2013. That goal dropped to 10% of the time in October 2015. (Docket Entry No. 48 at 40). They also point to the repeated goal of a post-school law-enforcement job to argue that C.J. "stagnated with the same old law enforcement goal." (Docket Entry No. 43 at 40). Finally, they note that C.J. continued to have behavioral problems. (Docket Entry No. 43 at 40).

The record as a whole does show that C.J. continued to struggle with the issues created by his disabilities, including trouble concentrating or maintaining attention, frustration, classroom disruptions, and speaking out of turn. (Docket Entry No. 6-19 at 69, April 2015 Plan). C.J. was "easily overwhelmed," would refuse "to comply with classroom rules or adult directives," and "seemed unaware of common social boundaries or the idea of personal space." (*Id.*). The record also shows that the five-month absence from school—essentially the second semester of 8th grade—set him back. But the record also shows passing grades, as well as behavioral and academic progress. "He was observed to make eye contact when speaking with his peers, to sustain conversations appropriately by asking questions, and display appropriate facial expressions throughout interactions." (Docket Entry No. 6-21 at 19, August 2015 Plan). "Although, at times, C.J. has preferred interests (i.e., how tall everyone is), he can be redirected easily and this does not appear to disrupt academic progress." (*Id.*). "When presented with Unique curriculum, C.J. is able to successfully complete assignments with 75-80% accuracy," and he "responds to verbal directions with minimal redirection." (Docket Entry No. 6-21 at 35, September 2015 Plan). "He achieved Mastery on Reading assessments through Unique in the fall of 2014." (*Id.*). The testimony of his

teachers noting his progress, despite the issues he struggled with, is consistent. (Docket Entry No. 6-22 at 19; Docket Entry No. 52-2 at 352–53).

"The IDEA guarantees an appropriate education, not a perfect education." *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *89. C.J. did not receive a perfect education, but the record supports the hearing officer's determination that the District provided C.J. with Individualized Education Plans and services that were reasonably calculated to, and did, result in meaningful academic and non-academic benefits. The record fails to demonstrate substantive violations that denied C.J. his right to a free appropriate public education. C.J.'s motion for summary judgment on this ground is denied, and the District's motion for summary judgment is granted.

### B.     Procedural Requirements under the Act

A procedural violation is generally not by itself a failure to provide a free appropriate public education. A procedural violation that results in "a loss of educational opportunity" may violate the Act. *Wood v. Katy Indep. Sch. Dist.*, 163 F. Supp. 3d 396, 401 n.3 (S.D. Tex. 2015) (quoting *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 (5th Cir. 2003)). "In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies— (i) Impeded the child's right to a FAPE; (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) Caused a deprivation of educational benefit." 34 C.F.R. § 300.513(a)(2)

C.J.'s parents allege that the District violated the Act's procedural requirements by failing to timely convene an ARD meeting during C.J.'s 8th grade year, to provide prior written notice of the District's denial of C.J.'s homebound services request and its refusal to fund an independent education evaluation, and to provide a statutorily compliant Individualized Education Plan for C.J.

for his 8th and 9th grade years. (Docket Entry 43 at 32–35). The District responds that the record evidence amply supports the hearing officer's finding and conclusion that C.J. failed to demonstrate procedural violations amounting to a denial of a free appropriate public education. (Docket Entry No. 46 at 37–38).

Each argument and response is considered below.

1. **The Claim that the District Failed to Convene a Timely Admissions, Review, and Dismissal Meeting**

C.J.'s parents argue that the District should have held an ARD Committee meeting between January 22, 2015 and April 30, 2015, the months of C.J.'s absence. They allege that the failure to have a meeting caused "a complete lapse in services for five months." (Docket Entry No. 43 at 32–33). The District responds that the April 2015 meeting was timely, and that any delay caused no substantive harm. (Docket Entry No. 47 at 11).

C.J. cites two cases in support of his argument that the failure to call an earlier ARD meeting is a procedural violation. (Docket Entry No. 43 at 33). Both cases are distinguishable. They involve school districts that failed to communicate at all with the parents of the student with disabilities. *See T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) ("persistent refusal" to discuss bullying); *Jackson v. Franklin Cnty. Sch. Board*, 806 F.2d 623, 625 (5th Cir. 1986) ("at no time" did the school "attempt to speak with or provide notice" to the parents about its decision to withhold educational services).

Here, by contrast, the District frequently contacted and communicated with C.J.'s parents. A communication log kept by the school staff shows repeated attempts to contact C.J.'s parents during his five-month absence. The log shows: an email on January 7, 2015; a phone message on

23

January 28, 2015; a meeting about needing a release for homebound documentation on February 5, 2015; a home visit on February 19, 2015; a call to arrange another home visit, noting that C.J. was not home, on February 28, 2015; a phone call to discuss C.J.'s absences and a transition plan on March 3, 2015; a meeting with C.J.'s father on March 9, 2015 about C.J.'s absences; a call on March 12, 2015 checking on paperwork for C.J.'s absences and offering to pick up C.J.'s schoolwork, and offer that C.J.'s parents declined; texts between C.J.'s parents and school staff about homebound services on March 19, 2015; a call from the school nurse to follow up C.J.'s homebound paperwork on March 23, 2015; a "casual chat" about C.J. returning to school "ASAP" when his mother dropped off completed schoolwork on March 24, 2015; a "casual conference" with C.J.'s mother when she "came by for assignments" for C.J. on April 10, 2015; and notification on April 22, 2015 about the ARD Committee meeting scheduled for April 30, 2015. (Docket Entry No. 27-6 at 2–3). After the April ARD Committee meeting, the contacts and communications continued: a home visit on May 7, 2015 to deliver paperwork, a progress report, and C.J.'s transition plan; emails between C.J.'s parents and school staff from May 19–22 about C.J.'s school visit on May 15 and requesting the parents' availability for an ARD Committee meeting; and the ARD Committee meeting on June 11, 2015. (Docket Entry No. 27-6 at 3).

The record evidence shows that the District did not fail to communicate with C.J.'s parents. To the contrary, the District made repeated efforts to work with C.J. and his parents to get him back to school during his extended absence and before and after that period. The timing of the District's April 2015 ARD Committee meeting did not violate the Act's procedural requirements.

> **2.  The Claim that the District Failed to Give Prior Written Notice of the District's Decisions Denying C.J. Services**

A school district must provide prior written notice when it proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or the provision of [free appropriate public education]." 34 C.F.R. § 300.503(a). C.J.'s parents allege that the District failed to provide prior written notice of its decisions to: (1) deny homebound services in response to the complaint C.J.'s parents made in January 2015; (2) change C.J.'s intensive special education program to homework dropoff; (3) offer Extended School Year services for 2015; and (4) decline to pay for the Independent Educational Evaluation C.J.'s parents requested in April 2016. (Docket Entry No. 43 at 34).

The record shows that the District provided C.J. with prior written notice of the denial of homebound services when those services were denied, at the April 2015 ARD meeting. (Docket Entry No. 6-1 at 78). C.J.'s parents had submitted a complaint about bullying on January 22, 2015. (Docket Entry No. 27-14 at 5-6). The record indicates that the District contacted C.J.'s parents to discuss the possibility of meeting their request for homebound services shortly after that complaint. At an in-person meeting on February 5, 2015, the District told C.J.'s parents that its established written policy required them to provide a physician's assessment and documentation of C.J.'s medical need for homebound services before the District could approve those services. (Docket Entry No. 27-9 at 33–38; Docket Entry No. 27-14 at 9–11). C.J.'s parents did not submit the completed medical referral information for homebound services, including responses to the District's requests for information from C.J.'s doctor, until April 2015. (Docket Entry No. 27-9 at 5). Based on that information, the District denied the request for homebound services at the April 30, 2015 ARD meeting. The District provided notice. No procedural violation occurred.

C.J.'s parents did not complete and submit the required information to apply for homebound

services, including documentation from C.J.'s doctor, until April 2015. (Docket Entry 27-9 at 15). From the time C.J.'s parents initially requested homebound services in January until April, they kept C.J. home from school. The District sent schoolwork to C.J. at home during his absence. (Docket Entry No. 52-1 at 261). C.J.'s parents refer to this as a change in placement from "C.J.'s intensive special education program to . . . a couple of visits to drop off homework." (Docket Entry No. 43 at 34). The District characterizes the homework dropoff as "an attempt to minimize the impact of C.J.'s absences while it awaited the homebound documentation." (Docket Entry No. 47 at 12). Ms. Pompa-Rodriguez, the District's Senior Manager of Special Education, testified at the due-process hearing that delivering schoolwork to C.J. at home "was just a suggestion to provide something for him, because he wasn't coming [to school]. . . . I wanted him to have – wanted him to know that the school wanted him back." (Docket Entry No. 52-1 at 262).

C.J.'s parents do not expand on their argument that delivering schoolwork to C.J. at home was a formal "change in placement." Nor do they explain why prior written notice was required in those circumstances. (Docket Entry No. 43 at 34). The Fifth Circuit has a "narrow interpretation" of "change of placement." *See Comb v. Benji's Special Educ. Acad., Inc.*, 745 F. Supp. 2d 755, 768 (S.D. Tex. 2010) (a change in location is not a "change in placement"). "Placement," the Fifth Circuit has stated, is not a location, but "means a setting, such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction." *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *47 (citing *White*, 343 F.3d at 379).

The cases addressing changes in placement involve situations in which school districts have made the change in placement. *See, e.g.*, *Spring Branch*, 2017 U.S. Dist. LEXIS 110524, at *2 (student transferred from one elementary school to another against the family's wishes and without

26

their input); *White*, 343 F.3d at 375 (school system selected centralized location for providing services to a student with disabilities, against the parents' wishes); *Weil v. Board of Elementary & Secondary Educ.*, 931 F.2d 1069, 1072 (5th Cir. 1991) (school district transferred student from one school to another, without explanation); *Comb*, 745 F. Supp. 2d at 767 (charter school abruptly suspended operations without notice to parents). In this case, even assuming that C.J.'s time spent at home was a "change in placement," the District did not unilaterally make that change. C.J.'s parents, not the District, decided to keep him home from school for five months. The District tried to convince C.J.'s parents to bring him back to school and to reduce the impact of his absence, including bringing him schoolwork. There was no official District change in C.J.'s placement that required notice beyond what C.J.'s parents received.

C.J.'s parents similarly fail to explain how the District failed to provide required prior written notice of the Extended School Year Services. (Docket Entry No. 43 at 34). The record shows that the District sent, and C.J.'s parents received, written notice about the Extended School Year Services as part of his June 11, 2015 Individualized Education Plan. (Docket Entry 6-20 at 67). A series of emails between C.J.'s mother and the District from June 18 to June 23, 2015, and phone messages left for C.J.'s mother on June 18 and June 22, 2015, told C.J.'s parents about the Services available in the summer of 2015. (Docket Entry No. 6-24 at 74–76). C.J.'s father testified at the hearing that he and C.J.'s mother "didn't acknowledge" the location the District offered for C.J.'s Extended School Year Services. (Docket Entry No. 52-2 at 135–37). C.J.'s parents did not look at the location. (*Id.*). The record shows that C.J. did receive the required notice of the services, but his parents decided that he would not participate.

C.J.'s parents finally allege that the District failed to give notice of its refusal to allow or pay

for an independent education evaluation. The parents of a child with a disability have "the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). In response to a request for an independent evaluation at public expense, a district must, without unnecessary delay, either file a due process complaint to request a hearing to show that its evaluation is appropriate, or ensure that the independent evaluation is provided. 34 C.F.R. § 300.502(b)(2).

C.J.'s parents first raised an independent educational evaluation during the administrative proceedings before the hearing examiner, in a motion to compel the District to allow an independent evaluator, privately hired by the family, to do an in-school observation. (Docket Entry No. 6-2 at 39). The motion to compel did not mention a request for the District to pay for the evaluation, but only requested that an evaluator hired by the family be allowed access to C.J.'s classroom to conduct an evaluation. In response, the District filed a counterclaim asking for a determination as to "whether The District's [full individual evaluation] is appropriate and whether Petitioner is entitled to a publicly funded [independent educational evaluation]." (Docket Entry No. 6-3 at 84).

On March 31, 2016, the hearing officer denied C.J.'s parents' request to compel the District to allow their independent evaluator access to C.J.'s classroom to conduct an in-school observation, on the ground that allowing third-party independent observation was contrary to the District's written policy. (Docket No. 6-3 at 120). The following day, C.J.'s parents submitted a request under 34 C.F.R. § 300.502 for an independent educational evaluation at public expense. *See* 34 C.F.R. § 300.502(b)(1) ("A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency."). The same day, the District's Deputy General Counsel, Hans Graff, forwarded the request to C.J.'s attorneys stating: "As

28

we are currently in litigation and we have previously filed a counterclaim to demonstrate the appropriateness of our [full individual evaluation], we are denying your request for an IEE." (Docket Entry No. 6-3 at 124, 128).

The District argues that it gave prior written notice of its refusal to pay for the independent educational evaluation. (Docket Entry No. 47 at 13–14). The record supports this argument. The record shows that the District gave the parents notice that it refused to pay for the requested evaluation in its email sent to C.J.'s attorneys on the same day the request was made. The District's counterclaim under 34 C.F.R. § 300.502(b)(2) provided notice to C.J.'s parents that it did not intend to allow or fund the independent evaluation, but rather sought a hearing to show that its own evaluation was appropriate. There was no notice violation.

### 3. The Claim That the District Failed to Provide Compliant Individualized Education Plans

C.J. alleges that the District violated his right to statutorily compliant Plans when it did not accurately track his progress and instead relied on historical data to update the Plans. (Docket Entry No. 43 at 35). C.J. does not identify case law or other support for his claim that an Individualized Education Plan based on historical data by itself violates the Act. The record undermines his claim that the Plan was based on such old data that it was inadequate. The record indicates that C.J.'s Plan was updated in June 2015, (Docket Entry No. 27-20), August 2015, (Docket Entry No. 6-20 at 60), and again in October 2015, (Docket Entry No. 6-21 at 80). From January to June 2015, C.J. was not attending school and there was no recent information to update the June 2015 Plan. Neither that Plan nor other Plans violated the Act by including historical data.

### 4. The Claim that the District's Extended School Year Services Policy Violated the Act

C.J.'s parents claim that the District's Extended School Year Services policy is inconsistent with the Act. (Docket Entry No. 39 at 46). C.J. does not point to a specific provision that the District's policy violates, but alleges that the violation "is about whether the individual choosing the location [of Extended School Year Services] and informing the parents is a part of the ARD process." (Docket Entry No. 48 at 34).

Under the Act, an Individualized Education Plan must include "the projected date for the beginning of the services and modifications . . . and the anticipated frequency, location, and duration of those services and modifications." 20 U.S.C. § 1414(d)(1)(A)(i)(VII). The record shows that the District recommended Extended School Year Services for C.J. in June 2015, and that C.J.'s parents received notice shortly thereafter through email and phone messages. (Docket Entry No. 6-20 at 60; No. 6-24 at 80). This notice complied with the Act's requirements. The District's emails and telephone communications included the start date, time, and location of the Extended School Year Services recommended for C.J. (Docket Entry No. 6-24 at 80). The record evidence amply supports the hearing officer's finding that the District offered C.J. Extended School Year services, but he did not access them. (Docket Entry No. 6-1 at 5).

### 5.    The Claim that the District Lapsed in Progress Reporting

The Act requires progress reporting in the form of "a description of how the child's progress toward meeting the annual goals . . . will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided." 20 U.S.C. § 1414(d)(1)(A)(i)(III). The District acknowledges a lapse in progress reporting, but argues that the record shows no substantive harm as a result. (Docket Entry No. 46 at 40).

The record evidence shows that C.J.'s Individualized Education Plan goals were not updated,

and therefore no progress reports were provided, from November 2014 to June 2015. (Docket Entry 6-7 at 181–82). C.J. attended school for only a few days from January to June 2015. (Docket Entry No. 46 at 40). He was not "accessing" his Individualized Education Plan during that period. The District had little or no information about his progress under a Plan he was not in school to use. The District promptly began to update the Plan in June 2015 by holding another ARD Committee meeting that same month and updating the Plan with the information available. (Docket Entry Nos. 6-7 at 181–82; 6-20 at 80–88; 27-6 at 5; 51-2 at 504). The record supports the hearing officer's finding that the lapse in reporting C.J.'s goals and progress were corrected; that the lapse did not harm C.J., given his extended absence from school during this period; and that the lapse did not, by itself or with other factors, deny C.J. a free appropriate public education.

### 6. The Claim that the District Improperly Denied C.J.'s Expert Access to C.J.'s Classroom to Conduct an In-Class Observation

The District argues that it had no obligation to grant C.J.'s parents' request for a private evaluator to be allowed to go to C.J.'s class and observe him in a classroom setting. (Docket Entry No. 46 at 41). As discussed, C.J.'s parents first made this request in a motion to compel filed with the special education hearing officer during the due-process proceedings. (Docket Entry No. 6-2 at 39). C.J.'s parents based the request on a claimed statutory right to an independent education evaluation. (Docket Entry No. 6-2 at 40); *see also* 34 C.F.R. § 300.502(b)–(c). In response, the District explained that it had a policy against allowing private-service providers to work in the District's schools. (Docket Entry No. 6-2 at 40). As the District notes, the Act does not require districts to allow private evaluators access to a classroom to conduct evaluations. (Docket Entry No. 46 at 41).

The District cites two guidance letters from the Office of Special Education Programs of the U.S. Department of Education. One letter stated that "neither the statute nor the regulations implementing the IDEA provide a general entitlement for parents of children with disabilities or their professional representatives, to observe their children in any current classroom or proposed educational placement." *Letter to Mamas*, 32 IDELR 10, at *2 (OSEP 2004). The second letter stated that "the IDEA and its implementing regulations do not provide a general entitlement for third parties, including attorneys and educational advocates, to observe children in their current classrooms or proposed educational placements. The determination of which individuals may have access to classrooms may be addressed by State and/or local policy." *Letter to Savit*, 64 IDELR 250, at *2 (OSEP 2014). This letter noted that a school district may be required to give an independent evaluator access to a classroom if the student's parents disagreed with a district's evaluation, exercised their statutory right to an independent educational evaluation under 34 C.F.R. § 300.502, and met the criteria. *See* 34 C.F.R. § 300.502(e)(1) ("If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation."); *see also* 64 IDELR 250, at *2. The District also notes that, until C.J. filed the motion to compel, his parents had not requested an independent educational evaluation. (Docket Entry No. 46 at 41).

The record evidence supports the hearing officer's decision to deny the motion to compel the District to give a private evaluator access to evaluate C.J. in his classroom. The District had no legal obligation to grant the request and was within its discretion to follow its established policy not to

allow third-party evaluators into its schools.

The record fails to demonstrate that any alleged procedural violation rose to the level of a substantive denial of C.J.'s right to a free appropriate public education. C.J.'s motion for summary judgment on this ground is denied and the District's motion for summary judgment is granted.

### C. The Claim that the Hearing Officer Issued a Flawed Decision

C.J.'s parents finally contend that the hearing officer's decision is contrary to the Act's requirements under 20 U.S.C. § 1415(f)(3)(A)(ii), (iii), and (iv). (Docket Entry No. 43 at 30). C.J.'s parents point to the length of the hearing officer's decision, a factual error about the year C.J. was in the 8th grade, the lack of specific credibility findings, and the characterization of the burden of proof as "high." (Docket Entry No. 43 at 30-31). C.J.'s parents summarize by asserting that the decision did not show "a clear and concise statement of the issues" or "provide sufficient or correct support for factual findings." (Docket Entry No. 43 at 31). In short, C.J.'s parents argue that the hearing officer was incompetent and that the decision was flawed in ways that violated the Act. The record undermines these arguments.

Section 1415(f)(3)(A) requires a hearing officer to have the "knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice" and to "render and write decisions in accordance with appropriate, standard legal practice." § 1415(f)(3)(A)(iii)–(iv). Comparing the length of the hearing officer's decision to a handful of other decisions shows little about its accuracy or reliability. Nor does this comparison reveal much about the hearing officer's competence to hear evidence, apply the law, and issue correct, reliable, fair decisions.

The one error C.J.'s parents point to—misstating the year C.J. attended 8th grade—does not, as C.J. argues, amount to the hearing officer's failure to "provide sufficient or correct support for

factual findings." (Docket Entry No. 43 at 30). The hearing officer showed a correct understanding of the timeline of critical events in other parts of the decision. There is no indication that this discrete factual mistake made the decision as a whole incorrect or unreliable.

C.J.'s parents similarly fail to demonstrate how the hearing officer's characterization of their burden of proof as "high" undermines the decision. (Docket Entry No. 43 at 31). The hearing officer explained that the burden is on the party seeking relief and that under the case law, there is a "presumption in favor of the district's educational program." (Docket Entry No. 6-1 at 7). The case law is consistent. *See Schaffer v. Weast*, 546 U.S. 49, 61 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."); *Tatro v. Texas*, 703 F.2d 823, 830 (5th Cir. 1983), *vacated in part by Tatro v. Texas*, 741 F.2d 82 (5th Cir. 1984) ("We are convinced that the central role of the IEP in the educational scheme contemplated by the [Education for All Handicapped Children Act (now the IDEA)] and in the standard of review developed in *Rowley* gives rise to a presumption in favor of the educational placement established by [the student's] IEP. Moreover, because the IEP is jointly developed by the school district and the parents, fairness requires that the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate.").

Finally, C.J.'s parents allege that the hearing officer failed "to make specific credibility findings," other than "to summarily state that unnamed school witnesses were credible." (Docket Entry No. 43 at 30-31). C.J.'s parents provide no support for the argument that credibility determinations must be explained with a specificity lacking in the decision here. C.J.'s parents acknowledge that the hearing officer did make credibility determinations, finding the District's witnesses credible. (Docket Entry No. 43 at 31). "As to credibility, although the Court reviews the

record *de novo*, as to this issue in particular it gives the [hearing officer's] findings due weight." *T.C. v. Lewisville Indep. Sch. Dist.*, No. 4:13cv186, 2016 WL 705930, at \*10 (E.D. Tex. Feb. 23, 2016). "The hearing officer, who hears live testimony and can observe witness demeanor, is in the best position to determine issues of credibility." *D.B. v. Houston Indep. Sch. Dist.*, No. Civ.A. H-06-354, 2007 WL 2947443, at \*11 (S.D. Tex. Sept. 29, 2007).

The hearing officer's decision met the Act's requirements. C.J.'s motion for summary judgment on this issue is denied, and the District's is granted.

## IV. Conclusion

The plaintiffs' motion for summary judgment is denied. The District's motion for summary judgment is granted. Final judgment is entered by separate order, dismissing the plaintiffs' claims with prejudice. Each party is to bear their own costs.

SIGNED on *November 1*, 2017, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge